SANFORD L. and SANDRA M. ABRAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Abrams v. Commissioner
Docket No. 6159-78.
United States Tax Court
T.C. Memo 1981-355; 1981 Tax Ct. Memo LEXIS 389; 42 T.C.M. (CCH) 355; T.C.M. (RIA) 81355; July 9, 1981
Sanford L. Abrams, pro se. Stanley H. Smith, Jr. and Mark W. Nickerson, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent *390 determined a deficiency in petitioners' Federal income tax for the year 1975 in the amount of $ 1,421.52. The sole issue for decision is whether petitioners sustained an ordinary loss or a capital loss upon the voluntary reconveyance of real property, encumbered by a nonrecourse purchase money mortgage, to their mortgagee/sellers without any monetary consideration. FINDINGS OF FACT All of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioners Sanford L. Abrams and Sandra M. Abrams resided in Marietta, Georgia, at the time they filed their petition in this case. They timely filed a joint Federal income tax return for 1975 with the Internal Revenue Service Center at Chamblee, Georgia. Petitioner Sandra M. Abrams is a party to this proceeding solely because she filed a joint return with her husband, and the term petitioner will hereinafter refer to Sanford L. Abrams. Petitioner has worked as a tax practitioner since 1962 and is presently employed as a Certified Public Accountant and the partner-in-charge of the tax department of the Atlanta, Georgia, office *391 of Alexander Grant and Company, C.P.A.'s. On or before September 29, 1973, petitioner, Julian D. Nealy, William F. Law, Jr., and R. Park Ellis (hereinafter buyers or co-tenants) agreed to purchase certain real estate and executed an "Agreement among Tenants in Common" (hereinafter agreement) setting forth the exclusive rights, duties, and responsibilities among themselves with respect to their proposed purchase. During all relevant times herein, Julian D. Nealy was an attorney specializing in commercial real estate law with a major Atlanta law firm; William F. Law, Jr., was an officer of a real estate mortgage servicing firm in Atlanta; and R. Park Ellis was a licensed real estate broker. On September 29, 1973, petitioner and his co-tenants purchased through Ellis two tracts of approximately 57.77 acres of unimproved or undeveloped real estate (hereinafter property) located in North Fulton County, Georgia, from the executors of the estate of Wade McCurry, Sr. (hereinafter sellers). The co-tenants purchased the property as an investment and entitled their investment venture "Old Bull Pen Associates" or "Old Bull Pen Road Associates." Petitioner held his interest in the property *392 as a capital asset. The total purchase price, as stated in the closing agreement, was $ 150,202. However, the sellers paid $ 211.03 of that amount as their share of the 1973 property taxes. The co-tenants paid $ 149,990.97 with a cash down payment of $ 22,319.27 and a purchase money mortgage for the balance of $ 127,671.70. The mortgage was evidenced by a secured note and a purchase money security deed on the property, both executed by Ellis. According to the terms of the note and deed, the debt was secured only by the property and not by the personal liability of petitioner or any of his co-tenants. Pursuant to the agreement, each buyer contributed at the time of the purchase $ 6,450 to cover his share of the down payment, property taxes, intangible tax, insurance, transfer tax, closing costs, and other costs pertaining to the purchase and holding of the property. Also pursuant to the agreement, Ellis executed a limited warranty deed to petitioner, Nealy, and Law, conveying to each his respective 25 percent undivided interest in the property. Although the agreement among the co-tenants required each buyer to execute a purchase money note and security deed in the face amount *393 of $ 127,671.70, this was never done. The note executed by Ellis called for annual payments of interest only for the first eight years (until 1981) at the rate of seven percent beginning September 29, 1974, and annual payments of principal and interest for the next seven years (until 1988) of $ 22,576.58 commencing September 29, 1982. By the end of 1974, the co-tenants had paid the first interest payment of $ 8,937.02 on September 29, 1974, and, of course, had paid no principal. The buyers made no improvements to the property while they held title to it and claimed no depreciation deductions with respect to it. By the end of 1974 and during 1975, the real estate market in and around the Atlanta, Georgia area suffered a downturn. On December 11, 1974, Ellis, acting on behalf of the co-tenants, wrote to Wade McCurry, Jr., (hereinafter McCurry), the principal executor handling the sale of the property, requesting that the two tracts contained in the 57.77 acres be split and covered by two separate security deeds and two separate notes in order to facilitate the sale of either parcel by itself. The buyers renewed their request in two subsequent letters to the sellers' attorney, *394 Mallory C. Atkinson, Jr., coming up with a specific proposal to that effect in May 1975. On June 9, 1975, however, the sellers rejected the buyers' proposal due to the fear that the buyers might sell the more valuable front tract of the property and then, because they had no personal liability, simply walk away from the less valuable rear tract. In a letter to McCurry dated September 15, 1975, Ellis stated that the buyers were not in a position to make the interest payment due on September 29, 1975, and requested that the sellers waive the 1975 interest payment in return for the buyers' continuing to hold the property and paying the 1975 real estate taxes due in the amount of $ 480.45. By September 15, 1975, both the buyers and the sellers believed that the value of the 57.77 acres was less than the outstanding mortgage. The sellers rejected Ellis' request to waive the 1975 interest payment, and the buyers did not tender payment of the interest on September 29, 1975. On October 9, 1975, the sellers, through their attorney Atkinson, gave formal notice of default to Ellis by certified mail, return receipt requested, as required by the promissory note and the security deed. Ellis *395 forwarded the sellers' notice of default to his co-tenants by a memorandum dated October 15, 1975, pointing out that the 30-day notice period would expire on November 13, 1975, and that the co-tenants would then be subject to foreclosure. On November 4, 1975, Ellis called Atkinson and reaffirmed that if the sellers would not waive the 1975 interest payment, the buyers would have to remain in default. McCurry called Ellis that same date and offered to waive all but $ 4,000 of the 1975 interest due if the buyers would also pay the 1975 property taxes. After a discussion on or about November 10, 1975, the buyers rejected the sellers' offer and decided that they would not continue to own the property or continue with the purchase agreement. On learning that the buyers did not intend to continue the purchase, Atkinson concluded that they were also not going to pay the past due property taxes for 1975. Atkinson thus forwarded the tax bills to McCurry for payment, and McCurry paid the taxes on December 3, 1975. On receipt of notices of past due taxes dated December 1, 1975, and pursuant to the advice of petitioner, Ellis also paid the 1975 taxes and interest, in the total amount of *396 $ 486.79, by check dated December 8, 1975. Thereafter, the office of the Fulton County Tax Commissioner notified the buyers in letters dated December 10 and 16, 1975, that the 1975 property taxes had already been paid on December 3, 1975. Prior to November 25, 1975, Nealy discussed with Atkinson the buyers' decision to "walk away from the deal." None of the buyers wished to have their names mentioned in any advertisement for a foreclosure action, and Atkinson did not want to come to Atlanta from his offices in Macon for any foreclosure proceedings. On December 9, 1975, the buyers, relying in part on petitioner's advice from a tax standpoint, reconveyed the property to the sellers by deed. Nealy modified the deed that Atkinson had prepared by deleting references to bargained and sold and consideration, and by adding the following language at the end of the property description: "This conveyance constitutes an abandonment of the described property by the grantors and is not a sale or exchange." The sellers did not object to these recitations being included in the deed as long as they were getting their property back. After Nealy obtained the signatures of his co-tenants, he mailed *397 the executed deed to Atkinson for recording and delivery to the sellers, thereby cancelling the sale, indebtedness and the entire transaction. The buyers received no monetary consideration from the sellers in return for the reconveyance, unless the sellers' payment of the 1975 property taxes can be considered as such. At the time of the conveyance, there had been no foreclosure action or threat thereof by the sellers, except the sending of the formal notice of default. At the time of the default on September 29, 1975, and continuing until the sellers received the reconveyance from the buyers, it was the intent and desire of the sellers to regain title to the 57.77 acres in the most practical and efficient manner possible for the sellers (which could include foreclosure) if the 1975 interest was not paid or if other satisfactory arrangements were not made. If the buyers had not offered to reconvey the property, the sellers would have requested them to do so and if the buyers had not complied with such a request, the sellers would have undertaken foreclosure proceedings by January of 1976. On their 1975 tax return, petitioners claimed an ordinary loss under section 165(a) and *398 (c)(2) [1] in the amount of $ 6,378.12 as an abandonment loss due to the reconveyance. The parties have since stipulated that the proper amount of petitioners' loss is $ 6,266.99. [2] Respondent, however, has determined that petitioners' loss resulted from the sale or exchange of a capital asset and was thus a long term capital loss under section 165(f), 1211, and 1212. OPINION Sections 165(a) and (c)(2) [3] allow a deduction from ordinary income for losses incurred in transactions *399 entered into for profit. However, section 165(f) [4] limits this allowance by providing that losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. The parties have stipulated that petitioners' interest in the mortgaged property was a capital asset. Therefore, the only question is whether petitioners' reconveyance of the property to the mortgagee was a "sale or exchange." Petitioners argue that their voluntary reconveyance of the property to the mortgagee was an abandonment and did not constitute a sale or exchange, since (1) the transaction *400 was not equivalent to a foreclosure sale, and (2) they received no consideration from the extinguishment of their nonrecourse indebtedness. This Court has already rejected those arguments in Freeland v. Commissioner, 74 T.C. 970 (1980) and Arkin v. Commissioner, 76 T.C.     (June 25, 1981). [5]
In Freeland v. Commissioner, supra, at 982-983, we held that: petitioner's voluntary reconveyance of the property to the mortgagee for no monetary consideration (boot) was a sale within the meaning of sections 1211 and 1212 of the Code, even though petitioner had no personal obligation on the mortgage debt, the fair market value of the property at the time of the reconveyance was less than the unpaid balance due on the mortgage debt, and petitioner had received no tax benefits in the form of depreciation deductions with respect to the property while he held it. We concluded there, as we must in this case, that the taxpayer's loss was *401 a capital loss, not an ordinary loss. If anything, the facts in this case are even stronger than those in Freeland. Here the payment by the sellers of the 1975 property taxes that were past due on the property might well constitute "boot" or consideration received by the buyers. See 74 T.C. at 981. The facts also clearly show that if the buyers had not voluntarily reconveyed the property, the sellers would have taken steps, including foreclosure proceedings, to get the land back. On its facts, this case is perhaps closer to the traditional foreclosure situation in Helvering v. Hammel, 311 U.S. 504 (1941) than to the voluntary abandonment situation in Freeland. In any event, our opinion in Freeland is dispositive of this case. Petitioners' loss was a capital loss subject to the limitations in sections 1211 and 1212. Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year here involved. ↩
2. The computation of this amount is set out at length in paragraph 12 of the stipulation. The Court permitted the parties to file supplemental briefs to consider the Court's opinion in Freeland v. Commissioner, 74 T.C. 970↩ (1980). In his supplemental brief, respondent took the opportunity to argue that the evidence of record showed petitioner's loss was only $ 6,099.88 and to come up with new computations in support of that figure. The Court will disregard this argument and rely upon the loss figure stipulated by the parties.
3. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and ↩
4. (f) Capital Losses↩.--Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in section 1211 and 1212.
5. See also Hope v. Commissioner, T.C. Memo. 1981-324; De Gennaro v. Commissioner, T.C. Memo. 1980-486; and LaPort v. Commissioner, T.C. Memo. 1980-355↩.